**FEDERAL DEPOSIT INSURANCE CORPORATION, et al., Plaintiffs,**

v.

**James P. LINN, et al., Defendants.**

No. 86 C 9812.

United States District Court, N.D. Illinois, E.D.

Oct. 6, 1987.

Robert F. Finke, Beverly J. Klein, Vincent S. Oleszkiewicz, Mayer, Brown & Plait, Chicago, Ill., for FDIC.

Craig Miller, Davis Wright & Jones, Seattle, Wash., for Seattle–First Nat. Bank.

Jeffrey J. Keck, Hamm, Keck & Pawlan, Ltd., Chicago, Ill., Drew Neville, B.J. Rothbaum, Jr., James W. Morris III, Linn & Helms, Oklahoma City, Okl., for defendants.

David M. Meister, Peter Petrakis, Katten Muchin & Zavis, Chicago, Ill., for third-party defendant Continental Illinois Nat. Bank & Trust Co. of Chicago.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Federal Deposit Insurance Corporation ("FDIC") and Seattle–First National Bank ("S–F") initially sued James and Ann Linn (collectively "Linns"), ASA Energy Corporation ("ASA"), Red Stone Energies, Ltd. ("Red Stone") and Cobra Drilling, Inc. ("Cobra") to collect amounts allegedly due on two promissory notes (the "Notes") executed by Linns and on limited recourse guaranties (the "Guaranties") executed by ASA, Red Stone and Cobra. Defendants then filed counterclaims against FDIC and S–F and joined Continental Illinois National Bank and Trust Company of Chicago ("Continental") as a third-party defendant under Fed.R.Civ.P. ("Rule") 14(a).

FDIC and S–F have now moved (1) for summary judgment under Rule 56 and (2) to dismiss defendants' counterclaims under Rule 12(b)(6) for failure to state claims upon which relief can be granted. In addition, Continental has moved to dismiss defendants' third-party claims. For the reasons stated in this memorandum opinion and order, all the motions are granted—defendants lose on all fronts.

### Facts [1]

Before 1982 Linns and the defendant corporations were actively involved in exploring for oil and natural gas.[2] To finance those explorations Linns, ASA and Red Stone borrowed extensively from Penn Square Bank, N.A. ("Penn Square") in Oklahoma City. Continental and S–F (collectively "Banks") participated in those loans under agreements with Penn Square.

On July 5, 1982 Penn Square failed and FDIC stepped in as its receiver. FDIC then proceeded to transfer certain Penn Square loans, including those to Linns,

---

[1]. These facts are drawn from the parties' evidentiary submissions. Comparison of the parties' filings under this District Court's General Rules 12(e) and (f) discloses that almost none of the facts in this case—and certainly no outcome-determinative facts—are disputed. That comparison (1) demonstrates the utility of those General Rules and (2) explains why references to the separate submissions are generally not necessary.

[2]. James Linn cryptically refers to ASA, Red Stone and Cobra as (Linn Aff. ¶ 2):

small family corporations in which I held an interest.

FDIC and S–F have suggested in their memoranda, but have not sought to prove, that Linns own and control ASA, Red Stone and Cobra. Linns' assumption of the corporations' debts (see n. 4) and the linked renegotiation of the individual and corporate debts (see n. 5) suggests FDIC and S–F may be right. Nothing hangs on the extent of Linns' ownership, however.

ASA and Red Stone, to the banks that had participated in those loans. Defendants' debts to Penn Square thus became debts to Continental or S–F.[3]

By 1985 the same collapse in oil and gas prices that had precipitated Penn Square's demise caught up with Linns, ASA and Red Stone, and they began negotiations with Banks on restructuring their debt. Those negotiations resulted in a "Consolidated, Amended and Restated Credit Agreement" (the "Agreement") and the Notes and Guaranties at issue in this case. Under the Agreement:

1. Linns', ASA's and Red Stone's debts to Continental and S–F were extended and consolidated into the Continental Note for $25,320,951 and the S–F Note for $9,747,236, each with new repayment terms. Linns were the sole signatories on those Notes.[4]

2. Linns agreed to waive any defenses to those debts, pledged additional collateral and made an initial $9 million payment on the debts.

3. ASA, Red Stone and Cobra executed the Guaranties to Banks of the entire amounts payable by Linns under the Notes.[5]

Among the defenses waived by Linns as a condition to the Agreement were those involving two guaranties of loans to corporations other than ASA, Red Stone or Cobra.[6] Because those guaranties are central to Linns' defense in this case, they must be described in some detail.

James Linn had executed several blank guaranty forms for Penn Square. Those forms were to be used only with his express consent. Though consent was never given, sometime after Penn Square failed someone filled in one of those forms as a guaranty of a loan to Gilbraltar Exploration Ltd.–Fund C (the "Gibraltar Guaranty"). That guaranty was among the instruments FDIC transferred to S–F. In the Agreement Linns agreed to pay $300,000 to satisfy any claims by S–F under that guaranty.

In 1982 James Linn agreed to guarantee a loan of up to $3 million by Penn Square to OTex Energy, Inc. (the "OTex Guaranty")—conditioned, however, on any loans to OTex being fully collateralized. Linn believes Continental participated in a later Penn Square loan to OTex for $1.6 million. Continental allegedly applied the collateral for that loan to a pre-existing OTex debt to Continental. Although the OTex Guaranty was not part of the debt involved in the Agreement, Continental did require Linns to recognize the validity of the OTex Guaranty in its full amount of $3 million as a condition to the 1985 renegotiation of Linns' debts to Continental. FDIC is not attempting to enforce the OTex Guaranty in this lawsuit.

As Linns admit, on July 29, 1986 they failed to make the payments required by the Agreement. Continental and S–F then accelerated the indebtedness due under the Notes (as the Agreement allowed them to do) and demanded immediate repayment in full from Linns. When Linns failed to pay the amounts owed ($17,779,279.28 on the Continental Note and $9,747,236 on the S–F

---

**3.** Defendants' pleadings included several allegations, that suggest the original participation agreements or the transfer by FDIC were somehow improper (see Amended Answer ¶¶ 10, 13). But on the current motions defendants have totally failed to explain or support those suggestions. Any purported grounds for attacking the obligations because of any such claimed improprieties are therefore deemed waived (*Ordower v. Feldman*, 826 F.2d 1569, 1576 (7th Cir. 1987)). Defendants do correctly point out that those participation agreements themselves gave Banks no rights against defendants. FDIC and S–F are enforcing the rights of Penn Square against defendants—rights Banks acquired from FDIC as Penn Square's receiver, and Continental's share of which was later transferred back to FDIC.

**4.** Linns thus became personally liable both for their own debts to Banks and for the preexisting debts of ASA and Red Stone.

**5.** ASA's and Red Stone's direct obligations to Banks were thus replaced by their Guaranties of Linns' entire debt under the Agreement. Cobra became obligated to Banks under its Guaranty, even though it owed nothing to either bank before the Agreement.

**6.** Linns in fact waived their defenses to all the debts underlying the Agreement (see Agreement ¶¶ 1(a) and 2(a)).

Note), Continental and S–F demanded payment under the Guaranties from ASA, Red Stone and Cobra. They too failed to pay the amounts demanded.

On October 29, 1986 Continental transferred to FDIC all its interests under its Note and the Guaranties. FDIC and S–F now sue to recover the amounts due, including accrued interest, costs and attorneys' fees, under the Notes and Guaranties.

### Defenses, Counterclaims and Third–Party Claims

Although Linns, ASA, Red Stone and Cobra admit executing the Notes and Guaranties, they contend those documents are unenforceable because executed under economic duress imposed by Banks. Defendants argue Banks wrongfully conditioned the restructuring of their debts on Linns' waiver of valid defenses to the Gibraltar Guaranty and the OTex Guaranty. They claim Banks threatened immediate litigation unless Linns agreed to their "unlawful" demands.

In addition to advancing that affirmative defense, defendants assert counterclaims against FDIC and S–F. They seek damages because of the alleged duress by Banks during the negotiating of the Agreement. They also claim damages under the Bank Holding Company Act (the "Act"),[7] 12 U.S.C. § 1975,[7] on the theory that Banks' demands violated the anti-tying provisions of Section 1972(1). Finally, Linns seek to recover a $5 million certificate of deposit, which S–F allegedly improperly seized and used as a setoff against their debt before the Agreement was negotiated.

In an effort to hedge against any potential liability on the Notes and Guaranties, defendants have also joined Continental as a third-party defendant on several grounds. First, defendants want to recover whatever amounts they may have to pay to FDIC.[8] That "indemnity" claim is based on Continental's alleged coercion during the negotiation of the Agreement.[9] Defendants also assert a damage claim against Continental under Section 1975. Finally, the third-party complaint asks for a declaration of unenforceability against, or alternatively for reformation of, a "collateral mortgage" (the "Louisiana Mortgage") pledged as additional collateral under the Agreement.

### Standards for Decision

This opinion is complicated by the nature of the several motions, by the existence of defendants' affirmative defense and by the nature of FDIC's involvement. On the FDIC and S–F Rule 56 motions for summary judgment on the Notes and the Guaranties, they must establish with competent evidence the lack of a genuine issue as to all the facts essential to their claims (*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). For that purpose this Court must draw all reasonable inferences from the evidence in the light most favorable to defendants (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)).

Those propositions are really academic here, for defendants do not challenge any of the essential elements of S–F's claims, while as to FDIC they contest only its standing to assert Continental's rights under the Continental Note. Instead of training their major guns on what FDIC and S–F must prove, defendants rely on an affirmative defense—economic duress (see *Gross Valentino Printing Co. v. Clarke*, 120 Ill.App.3d 907, 912–13, 76 Ill.Dec. 373, 377, 458 N.E.2d 1027, 1031 (1st Dist.1983); Rule 8(c))—as their primary basis for opposition to FDIC's claims, and their only one to S–F's.

On that score defendants bear the burden of persuasion (Annotation, *Economic Duress or Business Compulsion in Execution of Promissory Note* (hereafter "An-

---

**7.** Further references to the Act will take the form "Section—."

**8.** See Appendix.

**9.** As explained later in this opinion, defendants' third-party claim for duress is not pleaded in

indemnity terms. Defendants' memorandum opposing Continental's motion to dismiss has attempted to turn the claim into one for indemnity.

notation, *Economic Duress* "), 79 A.L.R.3d 598, 609 (1977)). If they hope to rely on duress to avoid summary judgment, they must come forward with some evidence to support their allegations of such duress (see *Celotex*, 106 S.Ct. at 2553). Matters are further complicated by FDIC's proffering of a federal-law defense (one unavailable to S–F) to defendants' affirmative defense. To the extent that federal-law defense proves essential to FDIC's success on its own claim, FDIC must prove that no material facts exist as to the essential elements of that defense.

In addition to their Rule 56 motions in support of their own claims, FDIC and S–F move under Rule 12(b)(6) to dismiss defendants' counterclaims for failure to state a claim. Continental also challenges two of defendants' third-party claims under Rule 12(b)(6).[10] On those pleading-directed motions, this opinion must accept as true all well-pleaded factual allegations, drawing all reasonable inferences in defendants' favor (*Marmon Group, Inc. v. Rexnord, Inc.*, 822 F.2d 31, 34 (7th Cir.1987) (per curiam)). Defendants' claims cannot (*Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)):

> be dismissed for failure to state a claim unless it appears beyond doubt that the [defendants] can prove no set of facts in support of [their claims] which would entitle [them] to relief.

Finally, Continental challenges defendants' entire third-party complaint as improper under Rule 14(a). That brings into play Rule 14(a)'s standards, dealt with later in this opinion.

There is no totally logical sequence for dealing with the several issues and their interlocking standards. What this opinion will do is to focus first on defendants' objection to FDIC's standing, their only real attack on FDIC's prima facie case to recover on the Notes. Then this Court will turn to defendants' affirmative defense (and defendants' claims) of economic duress and to FDIC's defense to that argument. Finally, this opinion will consider defendants' remaining counterclaims and Continental's Rule 14(a) challenge to defendants' third-party claims.

### FDIC's Standing

Complaint ¶ 1 alleges:

> FDIC is the owner, holder and transferee of the Liabilities on the CINB Note and the Guaranties.

Defendants correctly insist FDIC cannot rely on that bare allegation to prevail on a Rule 56 motion. They argue the Illinois version of the Uniform Commercial Code ("UCC"), Ill.Rev.Stat. ch. 26, ¶ 3–301,[11] allows only the "holder" of an instrument to enforce it, and FDIC has not proved it is the holder (as defined by UCC § 1–201(20)) of the Continental Note and the Guaranties.

Defendants' argument on both issues conveniently ignores (1) another equally relevant provision of the UCC and (2) FDIC's evidentiary submissions.[12] True

---

**10.** That attack relates to defendants' third-party claim for duress and their claim for violations of Section 1972. As to the remaining third-party claim (regarding the Louisiana Mortgage), Continental asks for a more definite statement under Rule 12(e).

**11.** Further references to that statute will take the form "UCC § —." Although the Smith–Hurd compilation of the Illinois Revised Statutes shifted a few years ago to the use of the "¶" symbol, the Illinois General Assembly continues to use "§" for the internal numbering of statutes. That is especially appropriate for UCC references, where both the numbering and the use of "§" rather than "¶" in the Illinois version track the standard version of UCC generated by the Commissioners on Uniform Laws.

**12.** Although FDIC successfully beats back defendants' challenge to its standing under Illinois law, Illinois law does not necessarily provide the rules of decision either on that issue or on the question of economic duress (on which FDIC also prevails on the merits under Illinois law). Indeed *D'Oench, Duhme & Co., Inc. v. FDIC*, 315 U.S. 447, 456, 62 S.Ct. 676, 678, 86 L.Ed. 956 (1942), the same case on which FDIC relies for its possible federal law defense to defendants' affirmative defense, also stands for the more general proposition that questions involving FDIC–held notes are federal questions. In that respect, the Agreement specifically makes Illinois law applicable to all questions as to the Agreement and Notes, and the Guaranties do the same. That could pose a neat question as to whether such contractual provisions would be overridden simply because FDIC had become

enough, UCC § 1–201(20) does define a "holder" as someone who is in possession of an instrument endorsed to him, and FDIC has not proved the Continental Note and the Guaranties were ever so endorsed. But FDIC has shown without contradiction that it has the right to enforce the Continental Note and the Guaranties in its own name under UCC § 3–201(1):

> Transfer of an instrument vests in the transferee such rights as the transferor has therein except that a transferee who has himself been a party to any fraud or illegality affecting the instrument or who as a prior holder had notice of a defense or claim against it cannot improve his position by taking from a later holder in due course.

That provision effectively allows a transferee to enforce a note in its own name without an endorsement from the transferor, so long as the transferee proves delivery to it with an interest to pass title (see UCC § 3–201 Illinois Code Comment and cases cited in that comment).

Continental was admittedly a holder of the Continental Note and the Guaranties under UCC §§ 1–201(20) and 3–301. As FDIC contends and its evidentiary submissions prove (see Handler Aff. ¶ 2(c)), Continental transferred its rights under those instruments to FDIC before FDIC brought this lawsuit.

■ Defendants argue FDIC cannot enforce the Continental Note and the Guaranties because FDIC does not itself have physical possession of those instruments. Possession is in fact a requirement of UCC § 3–301 (see *Locks v. North Towne National Bank of Rockford*, 115 Ill.App.3d 729, 731, 71 Ill.Dec. 531, 533, 451 N.E.2d 19, 21 (2d Dist.1983))[13] and is implied by the UCC § 3–201 requirement of a "delivery." But the affidavit of Continental's employee Martin Handler (Aff. ¶¶ 1, 3) establishes Continental is holding those instruments for FDIC as its administrator. After all, every corporation must by definition employ agents to act for it—and there is no reason FDIC cannot use Continental, rather than some other agent, for that purpose. Thus Continental's possession *is* FDIC's possession of the instruments, and FDIC has proved itself a legal transferee.

Moreover, defendants themselves correctly note the purpose of UCC's delivery and possession requirements is to spare the obligor any risk of suit by the transferor as well as the transferee. Here the transferor is itself a party, has made no claim under the Note and has confirmed its intent to transfer its interests to FDIC. In this situation there can be no legitimate concern about double liability.

Continental's proved transfer of the Continental Note and the Guaranties gives FDIC all of Continental's rights to enforce those instruments. That is true even though FDIC lacks the technical "status" of a holder because the instruments were not endorsed to it (see UCC § 3–201 Uniform Commercial Code Comment 8; 4 Hawkland, *Uniform Commercial Code Series* §§ 3–201:02 and :03 (1984)). Of course that is not an unmixed blessing: FDIC has acquired the instruments cum onere. Under Illinois law defendants can assert against FDIC any defense to the Continental Note and the Guaranties that they could have asserted against Continental (see 4 Hawkland § 3–201:06).

Defendants have taken full advantage of that principle by asserting Continental's alleged economic duress as an affirmative defense to FDIC's claim on the Continental Note. In like manner, defendants' two

---

assignee. But that question, unaddressed by the litigants, is really rendered irrelevant by the obvious fact that federal law, if applicable, would have been at least as generous to FDIC as Illinois law. That would be the whole point of applying federal law to FDIC's obligations.

**13.** *Locks, id.* at 731–32, 71 Ill.Dec. at 533, 451 N.E.2d at 21 addressed the requirement of "possession" under UCC § 3–301. It also observed constructive possession might be sufficient under Illinois law (as it is in other jurisdictions) but refused to address the question because not raised there. *Locks* dealt with "possession" and related issues in the context of determining the enforcement rights (if any) of a mere beneficial owner of a debt instrument, rather than a "holder" or a non-"holder" transferee of that instrument—a very different question from that presented in this case.

counterclaims against FDIC allege no wrongdoing by FDIC itself—so they represent an attempt to set off any damages caused by Continental against any liability to FDIC on the Continental Note.[14] Whether a transfer under UCC § 3–201 includes setoffs is not answered by UCC itself, and neither side addresses that issue under Illinois law (see 4 Hawkland § 3–201:06). Instead FDIC relies on federal law to protect it from defendants' affirmative defense and setoffs.

### Section 1823(e) and Federal Common Law

■ FDIC's first line of defense (and offense) seeks to invoke federal-law protections unavailable either to Continental or to any other transferee to whom Continental might have assigned the Continental Note or the Guaranties.[15] For that purpose FDIC points to Section 1823(e) and the principles of federal common law announced in *D'Oench,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956. Unfortunately FDIC does not satisfactorily explain how or why either Section 1823(e) or *D'Oench* protects it from defendants' affirmative defense or counterclaim.

*D'Oench,* 315 U.S. at 456, 62 S.Ct. at 678 held—despite *Erie v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)—federal common law and not state law had to be applied to the question of liability on a note held by FDIC. *D'Oench, id.* 315 U.S. at 459, 62 S.Ct. at 680 (quoting with approval from *Mount Vernon Trust Co. v.*

*Bergoff,* 272 N.Y. 192, 196, 5 N.E.2d 196, 197 (1936)) then went on to decide that federal common law:

> requires that a person who, for the accommodation of the bank executes an instrument which is in form a binding obligation, should be estopped from thereafter asserting that simultaneously the parties agreed that the instrument should not be enforced.

Congress codified that principle in Section 1823(e) (see *FDIC v. Venture Contractors, Inc.,* 825 F.2d 143, 148 (7th Cir.1987)), which provides:

> No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

FDIC claims *D'Oench* and Section 1823(e) (FDIC R.Mem. at 8):

> prohibit defendants from raising defenses based upon conduct of Continental

---

**14.** Defendants' Local Rule 12(f) statement confirms just that. However, defendants make no effort to explain how or why they assert both a duress affirmative defense and a duress setoff claim. After all, if the former were to succeed, defendants would have no liability against which they can set off any "damages" under their duress claim—surely defendants cannot collect *from FDIC* whatever amounts they have already paid *to Continental* under the Note (see Appendix). On the other side of the coin, if defendants' duress *defense* is blocked under federal law or on its merits, their duress *claim* will fail as well. That one-to-one correlation of results may be contrasted with Continental's alleged violation of Section 1972: That could not provide a defense to the Continental Note (see *Exchange National Bank of Chicago v. Daniels,* 768 F.2d 140, 144 (7th Cir.1985)), but it could

provide defendants with a setoff if their affirmative defense fails.

**15.** FDIC also says the parol evidence rule bars defendants' affirmative defense. That assertion is less than specious. As every lawyer (including FDIC's) learns in the first year of law school (4 *Williston on Contracts* § 631, at 950 (1961)) (emphasis added):

> [E]vents antecedent to the making of a contract which negate mutuality of assent, such as *duress* or fraud, or demonstrate a condition to be fulfilled before the obligations of the contract are to vest, may also be the subject of parol evidence.

FDIC cites nothing to contradict that fundamental principle.

Bank as transferor bank if that conduct tends to diminish or defeat the right, title or interest of FDIC in the asset which it acquired.

In FDIC's view, then, defendants cannot use Continental's alleged duress to invalidate the Continental Note (see *FDIC v. MM & S Partners*, 626 F.Supp. 681, 687 (N.D. Ill.1985)), nor can they use any damage claims they might have against Continental as a setoff against their liability to FDIC under the Continental Note (*FDIC v. Smith*, 466 F.Supp. 843, 845 (N.D.Ga. 1979)). Defendants identify two problems with FDIC's argument, and this Court has found a third as well.

As *FDIC v. Powers*, 576 F.Supp. 1167, 1170 (N.D.Ill.1983), *aff'd mem.*, 753 F.2d 1076 (7th Cir.1984) explains:

> It should be noted at the outset that the language of § 1823(e) only denies validity to certain unwritten agreements, and does not bar extrinsic proof that a written document in fact does not reflect any valid agreement.

*MM & S Partners*, 626 F.Supp. at 684 & n. 2 (though relied on by FDIC) noted the same limitation on Section 1823(e). Indeed our Court of Appeals has suggested (though it was not required to decide) that fraud independent of any understanding or side agreement is outside Section 1823(e) (*FDIC v. O'Neil*, 809 F.2d 350, 354–55 (7th Cir.1987)). As chance would have it, a related question is being argued before the Supreme Court next week on certiorari from *Langley v. FDIC,* 792 F.2d 541 (5th Cir.1986) (see — U.S. —, 107 S.Ct. 871, 93 L.Ed.2d 826 (1987)). That may perhaps cast light on the independent-fraud-in-the-inducement issue as well. But unless and until the Supreme Court teaches otherwise, this Court will follow the existing authorities (including the signal from *O'Neil*).*

Defendants' claim of economic duress would also lie outside Section 1823(e) under the reasoning of those cases. Defendants do not say the Notes are invalid because Banks failed to comply with an agreement not contained in Banks' records or the Notes themselves. Rather defendants argue the Notes and Guaranties are invalid because Banks coerced defendants into executing them. That type of defense, like one based on fraud, is not barred by Section 1823(e).

Maybe FDIC could maneuver around that case law to foreclose defendants' use of their Section 1972 counterclaim as a setoff against any liability to FDIC on the Continental Note.[16] In that event, FDIC would immediately face another obstacle: It has failed to show it acquired the Continental Note "either as security for a loan or by purchase"—a prerequisite to invoking the protection of Section 1823(e) (*FDIC v. Kessler*, 220 So.2d 391, 392 (Fl.App. 1969)).[17]

Thus Section 1823(e) alone does not extricate FDIC here. But the analysis does not end there, for several courts have held the protection provided FDIC by the *D'Oench* federal common law principles goes beyond that afforded by Section 1823(e) (see, e.g., *FDIC v. Leach*, 772 F.2d 1262, 1267 (6th Cir.1985)). That assertedly broader scope was the basis for *MM & S Partners*, a case FDIC urges on this Court. However, an obvious difficulty (wholly unaddressed by the parties here) suggests itself in that respect: Section 1823(e) may well have preempted the operation of federal common law recognized in *D'Oench* (see *Powers*, 576 F.Supp. at 1172 n. 2). Fortunately this Court is not called on to resolve either of the questions identified in this paragraph. Because defendants' claims of duress and violations of Section 1972 fail on their mer-

---

* *Langley* has now been decided by the Supreme Court (— U.S. —, 108 S.Ct. 396, 98 L.Ed.2d —). If anything, the decision buttresses FDIC's position here, but the precise effect is for the Court of Appeals to assess on the now-pending appeal from this decision.

**16.** That claim, after all, would be based on an "agreement": one to condition the Agreement on defendants' recognition of the Gibraltar and OTex Guaranties.

**17.** FDIC has inexplicably ignored that second contention even though it is (1) based on the express language of Section 1823(e) and (2) supported by case law. Of course it is common knowledge that FDIC "purchased" several billion dollars in questionable loans as part of its bailout of Continental. But (1) that bulk purchase does not qualify for judicial notice in evidentiary terms and (2) more important, FDIC has made no effort to prove that purchase included the Continental Note at issue in this case.

its, FDIC has no need for whatever shield federal common law might provide.

### Economic Duress

■ As already indicated, defendants' multiple assertion of economic duress requires differing procedural treatments on the current motions. To the extent duress is advanced as an affirmative defense, it is under attack via Rule 56 (thus calling for evidentiary consideration). To the extent duress grounds defendants' claims against FDIC, S–F and Continental, their Rule 12(b)(6) motions limit this Court's consideration to the pleadings.

Nonetheless the entire duress package can be evaluated at once. FDIC and S–F do not challenge defendants' duress defense by questioning any supporting facts offered by defendants. Instead they attack the legal sufficiency of defendants' factual predicate for the existence of economic duress. That onslaught applies with equal force to defendants' allegations in support of their duress claims. In fact defendants' affidavits in support of their duress defense essentially parallel the allegations in their duress claims.[18] To the extent the affidavits do add facts, they are not material to the legal sufficiency of either defendants' defense or their damage claims.

Illinois law clearly recognizes economic duress as an affirmative defense to an action on a contract or note (see, e.g., *Gerber v. First National Bank of Lincolnwood*, 30 Ill.App.3d 776, 332 N.E.2d 615 (1st Dist. 1975)). As explained in *Alexander v. Stan-*

*dard Oil Co.*, 97 Ill.App.3d 809, 814–15, 53 Ill.Dec. 194, 198, 423 N.E.2d 578, 582 (5th Dist.1981) (citations omitted):

Economic duress is present where one is induced by a wrongful act of another to make a contract under circumstances which deprive him of the exercise of free will, and a contract executed under duress is voidable.... To establish duress, one must demonstrate that the threat has left the individual "bereft of the quality of mind essential to the making of a contract."

Defendants claim Banks "extracted" the Agreement, Notes and Guaranties from them (Amended Answer ¶ 38):

using the threat of immediate litigation over all purported debt of the Linns or of entities in which the Linns owned an interest, whether that purported debt be valid or invalid, direct or contingent....

Because of that "coercion" defendants argue the Agreement, the Notes and the Guaranties are "void and unenforceable." That argument turns the concept of economic duress on its head. It is no better than frivolous in the legal sense.

Defendants cannot avoid the deficiencies in their legal theory merely by arguing the existence of economic duress is a factual question to be resolved by a jury. This Court can and must determine the existence or nonexistence of a factual question that can even get to a jury (*Alexander*, 97 Ill.App.3d at 814, 53 Ill.Dec. at 198, 423 N.E.2d at 582). In this instance defendants fail as a matter of law on the economic duress issue (see *Higgins v. Brunswick*

---

**18.** James Linn's affidavit, the centerpiece of defendants' submissions, is troublesome in several respects. It repeats verbatim many of the allegations in defendants' answer and counterclaim. Many of his assertions are not based on personal knowledge or are legal conclusions—a direct violation of Rule 56(e). Linn, himself a lawyer, must know such "evidence" would be inadmissible at trial and is therefore unavailable to support an affirmative defense to a motion for summary judgment. And Linn's lawyers surely know that (his lawyers are his own Oklahoma City law firm—one of the largest in that city, with some 30 lawyers and with Linn as one of the two name partners). Because FDIC and S–F have not asked this Court to strike the improper portions of the Linn affidavit, its evidentiary

problems will not be treated in detail. However, the deficiencies are noted where they become relevant. Another evidentiary difficulty with defendants' presentation stems from their tendency to lump defendants as a group, rather than distinguishing between them based on their respective rights and obligations. To the limited extent the affidavit submissions bear at all on the corporate defendants (whose chief executive officer is Linn's law partner, the other name partner in their law firm), they tend to blur the fact that duress might apply (or not apply) to different parties differently. This opinion rejects the legal positions of all defendants even without reference to such looseness on their part (but see nn. 23, 25 and 27).

*Corp.*, 76 Ill.App.3d 273, 278, 32 Ill.Dec. 134, 138–139, 395 N.E.2d 81, 85–86 (1st Dist.1979)).[19]

As defendants would have it, Banks' requiring them to waive supposedly valid defenses to two obligations somehow excuses defendants from fulfilling other admittedly valid obligations.[20] Defendants cite no authority for that proposition, because there is none to cite.

Duress is a defense to obligations to which a party would not otherwise agree, were it not for the other party's wrongful and oppressive demands (see *Gerber*, 30 Ill.App.3d at 779–80, 332 N.E.2d at 618). Here defendants needed to renegotiate their admittedly valid debts. Their alternative was bankruptcy.[21] As a condition to such renegotiation, Banks required Linns to waive defenses to certain disputed debts: the Gibraltar and OTex Guaranties. Even

if that conduct had amounted to duress, defendants would have been entitled to avoid their waiver of any defenses to those disputed guaranties—but they cannot escape admittedly valid debts to FDIC and S–F (see *Citibank, N.A. v. Bearcat Tire, A.G.*, 550 F.Supp. 148, 151 (N.D.Ill.1982)). Their waivers regarding the disputed guaranties are easily severable from the rest of the Agreement, which is otherwise completely proper (see *Kaplan v. Keith*, 60 Ill.App.3d 804, 808, 18 Ill.Dec. 126, 128, 377 N.E.2d 279, 281 (1st Dist.1978)).[22]

That analysis, however, is oversimplistic—perhaps stimulated by defendants' own fundamental misuse of the concept of economic duress.[23] In a sense it suffers from the same vice as defendants' approach—it collectivizes defendants rather than recognizing their individual identity

19. FDIC and S–F repeatedly insist that even if defendants could use economic duress as a defense to the Agreement and the Notes, that duress would not invalidate the obligations underlying the Agreement. Though that is true, it does nothing to help FDIC and S–F in this case. After all, their claims are based on the Notes and not on the obligations underlying the Notes.

20. Defendants repeatedly refer to their debts—both those underlying the Agreement and those resulting from the Agreement (the Notes)—as "purported." That glosses over their total failure to offer any reason why they should not be obligated to repay all their debts, with the possible exception of that attributable to the Gibraltar Guaranty (defendants' obligations under the OTex Guaranty are not at issue here). Defendants did borrow money from Penn Square, and they have never repaid it. Penn Square's right to be repaid was validly transferred to Banks (see text at n. 3), and FDIC has validly obtained Continental's rights. To the extent defendants could have asserted any defenses or objections to debts at issue in this case, other than those raised as to the Gibraltar Guaranty, those objections must be deemed waived (*Ordower*, 826 F.2d at 1576).

21. Linn's financial advisor Donald Smith supports defendants' assertion that their only alternative to giving in to Banks' demands was bankruptcy (Smith Aff. ¶ 5). Smith also says (perhaps inadvertently) Linns' waiver of their defenses to certain guaranties was "agreed upon." Of course, defendants' entire defense is premised on their position that the waivers were extorted rather than "agreed upon." However, this opinion will not take advantage of what may have been inadvertent phrasing.

22. Indeed, the OTex Guaranty is not even included in the Agreement and is not sought to be enforced by Continental or FDIC in this case. As for the Gibraltar Guaranty, it is included in a discrete section of the Agreement that recognizes Linns' objections and adopts $300,000 as a settlement of S–F's claims under that Guaranty. Other than that provision, defendants raise no objections to the terms of the Agreement. It did exactly what defendants wanted: It extended their valid obligations to Banks, thus giving defendants relief from the pressures of bad economic times. Although defendants might be able to use claims of duress to avoid the "wrongful" portion of the Agreement (see *Kaplan, id.* at 808, 18 Ill.Dec. at 128, 377 N.E.2d at 281), they cannot use those claims to avoid their valid, renegotiated obligations (see *Citibank*, 550 F.Supp. at 151).

23. Defendants' generalized approach to economic duress would be a problem for them even if they had succeeded in satisfying the basic factual prerequisites for such a defense. James Linn effectively eliminated any "duress in the air" arguments when he (carefully?) avoided saying he controlled ASA, Red Stone and Cobra (see n. 2). Even had Linn succeeded in raising a factual question as to whether *his* free will was overborne, ASA, Red Stone and Cobra have not called into question *their* having acted voluntarily when they executed the Guaranties (see nn. 18, 25 and 27). Linns' avoidance of personal liability on the Notes would not automatically allow ASA, Red Stone and Cobra to escape liability under the Guaranties. That would require an examination of the terms of the Agreement and Guaranties.

(see n. 23). For if Linns as individuals *were* the victims of economic duress, it must be recognized that the renegotiation did require them to undertake personal responsibility for some debts that had previously burdened only the corporations. That being so, it would be necessary to sort out—by severance or otherwise—the obligations enforceable against each defendant.

In consequence it becomes necessary to examine defendants' version of the disputed transactions in greater detail. That examination discloses defendants have failed as a matter of law to establish a defense to *any* of FDIC's and S–F's claims, *including* any claim based on the Gibraltar Guaranty [24] or on any other debts undertaken by any defendant in the renegotiation. They have failed to advance any facts tending to show Banks' conduct was "wrongful" or sufficiently coercive as to overcome defendants' free will (see *Alexander,* 97 Ill.App.3d at 816, 53 Ill.Dec. at 199–200, 423 N.E.2d at 583–84).[25]

Defendants argue it was legally wrongful for Banks to condition the Agreement on Linns' waiving potential defenses to the Gibraltar and OTex Guaranties. Under Illinois law (*id.* at 815, 53 Ill.Dec. at 198–199, 423 N.E.2d at 582–83 (citations omitted)):

> However, the term "wrongful" is not limited to acts that are criminal, tortious, or in violation of contractual duty, but extends to acts that are wrongful in a moral sense as well.... In terms of

"economic duress," also known as "business compulsion," the defense of duress cannot be predicated upon a demand which is lawful or upon doing or threatening to do that which a party has a legal right to do.... Furthermore, duress does not exist where consent to an agreement is secured because of hard bargaining positions or the pressure of financial circumstances. Rather, the conduct of the party obtaining the advantage must be shown to be tainted with some degree of fraud or wrongdoing in order to have an agreement invalidated on the basis of duress.

By asking Banks to renegotiate their debts, defendants were asking them to waive their *right* to collect those debts on their original terms. Neither Bank was legally or contractually obligated to grant that request. Rather than negotiating piecemeal, Banks decided to consolidate their debts and establish new, uniform repayment terms. They were entitled to do that.

In return for their forbearance, Banks (1) required Linns to undertake primary responsibility for their own personal debts plus those of ASA and Red Stone, (2) had ASA, Red Stone and Cobra execute Guaranties for that entire debt and (3) asked defendants to pledge additional collateral. In addition Banks required defendants to waive any potential defenses to the renegotiated debt.[26] As explained later in this

**24.** Once again, because Linns' obligations under the OTex Guaranty are not at issue here, this opinion does not resolve whether Linns might have some defense based on economic duress to any attempt to enforce that guaranty.

**25.** Only James Linn has provided an affidavit as to the circumstances surrounding negotiation of the Agreement. FDIC and S–F contend he has not shown economic duress because his affidavit does not specifically say his free will was overborne by their conduct. They also argue Linn is not competent to say whether ASA's, Red Stone's and Cobra's free will was overborne (statements also missing from Linn's affidavit in any event). Whether economic duress existed is dependent on all the factual circumstances surrounding a transaction (*Higgins,* 76 Ill.App.3d at 278, 32 Ill.Dec. 138, 395 N.E.2d at 85)). Just as any assertion by Linn that his free will was overborne (really more of an ultimate conclu-

sion from the circumstances, rather than a testimonial fact) would not be dispositive, neither is his failure to make such an express assertion. What he does say is that certain concessions were extorted from him. As for ASA, Red Stone and Cobra, any duress as to them is also fact-dependent. Linn took part in the negotiations and is surely competent to testify as to what took place. Defendants' failure to distinguish among themselves does, however, raise other questions (see nn. 18, 23 and 27).

**26.** It will be recalled Banks also required Linns to waive their defenses to the OTex Guaranty, which is not part of the Agreement. Defendants could argue that conditioning the Agreement on their waiving a defense to an unrelated debt is wrongful. But the OTex Guaranty is "unrelated" only in the sense that Linns were not then, and apparently are not now, being asked

opinion, that condition did not violate Section 1972 and was not in any other sense unlawful (see, e.g., *Alexander, id.*).

Defendants apparently believe Banks should have required them to waive only defenses they did not have (surely a novel idea!) and should also have excluded the Gibraltar and OTex Guaranties from the renegotiation. Yet defendants were asking Banks to increase their risk of nonrepayment substantially, by extending the debts of individuals and companies in a troubled industry. Banks were entitled to drive a hard bargain and extract substantial concessions from defendants in return for Banks' own concessions (see *Higgins*, 76 Ill.App.3d at 277–78, 32 Ill.Dec. at 138–139, 395 N.E.2d at 85–86). Nothing in Illinois law calls for a holding that it is wrongful for banks to renegotiate a debtor's obligations as a package and to require the debtor to waive defenses as a requirement for such renegotiations [27]—and this federal court is unwilling to manufacture such a state law proposition.[28]

Threatening to do what someone is legally entitled to do is not generally wrongful (see *Gross Valentino Printing*, 120 Ill. App.3d at 912, 76 Ill.Dec. at 377, 458 N.E.2d at 1031), although there are limited exceptions (see generally *Oleet v. Pennsylvania Exchange Bank*, 285 A.D. 411, 137 N.Y.S.2d 779, 783 (N.Y.1955)). Banks' conduct does not fall within one of those exceptions. This is not a case like *Gerber*, 30 Ill.App.3d at 778–79, 332 N.E.2d at 617–18, where a bank linked the execution of a guaranty with a totally unrelated matter,

the guarantor's continued employment as an attorney representing the bank. Nor is this a case where a party uses the threat of breaching an existing contract to extort further concessions from the promisee (see *Kaplan*, 60 Ill.App.3d at 807, 18 Ill.Dec. at 128, 377 N.E.2d at 281). Here Banks demanded concessions as to defendants' debts (including cross-liability among related debtors) in return for Banks' own forbearance on collecting those same debts.

Defendants vainly attempt to bring Banks' demands within another exception by claiming their demands as to the Gibraltar and OTex Guaranties were made in bad faith because those obligations were void and Banks knew it. Some cases do hold threats to sue on an unfounded claim are wrongful (see Annotation, *Economic Duress*, 79 A.L.R.3d at 606). But defendants' allegations and evidence wholly fail to establish (or to support the reasonable inference) that Banks made their demands in bad faith.

Defendants' claimed defenses to the Gibraltar and OTex Guaranties are based on breaches of their oral agreements with Penn Square—apparently both guaranties are valid and enforceable on their face. That might spell potential *voidability*, but not *voidness*. Defendants could and in fact did ratify the guaranties. Defendants claim Banks knew of their "valid" defenses, but they say nothing to support Banks' awareness of defendants' agreements with Penn Square, let alone any breach of such agreements.[29] It cannot be labeled "bad

---

to pay out any money under that guaranty. That is why it was not made a part of the Agreement involving their actual matured debts to Banks. Defendants' failure to offer any authority for their theory of infectious invalidity (by which duress as to the OTex Guaranty would somehow taint their valid promises) really makes it unnecessary to decide whether Continental's inclusion of any issues regarding that guaranty in negotiations was indeed wrongful. But defendants have not offered anything persuasive in that respect either.

**27.** Only Linns were required to waive their defenses to the OTex and Gibraltar Guaranties, the only "wrongful conduct" asserted by defendants. By lumping themselves together, defendants do not explain whether (or how) that con-

duct was wrongful as to ASA, Red Stone and Cobra. Linns' waiver did increase ASA's, Red Stone's and Cobra's potential liability as to the S–F Note (which includes amounts attributable to the Gibraltar Guaranty), but did not at all affect the amount the corporations guaranteed as to the Continental Note, which does not include any debts attributable to the OTex Guaranty.

**28.** See, e.g., *Gust K. Newberg Construction Co. v. E.H. Crump & Co.*, 818 F.2d 1363, 1368 (7th Cir.1987).

**29.** Defendants could not rationally expect Continental or S–F to accept such defenses based on defendants' word alone. Defendants allege S–F knew about their agreement with Penn Square

faith" for Banks to require defendants to prove the existence of such agreements in court or to have a court decide the effect of any such agreements.

Defendants insist Banks' threat to initiate "wholesale litigation" on their debts unless defendants waived their defenses to the Gibraltar and OTex Guaranties compelled defendants to cave in to those demands.[30] They claim their alternative was bankruptcy.[31] This Court does not doubt defendants were between a rock and a hard place when they negotiated the Agreement, but what defendants blithely ignore is their own responsibility for their financial predicament.

Defendants borrowed large amounts of money from Penn Square to explore for oil and gas, a highly speculative business venture in the best of economic times. Defendants cannot deflect their full responsibility for the consequences of such risks—their inability to repay those debts on time—by pointing out Penn Square, Continental and S–F were eager to make such loans and profited from them.[32] Banks did not coerce defendants into borrowing money (see *Higgins*, 76 Ill.App.3d at 277–78, 32 Ill.Dec. at 138, 395 N.E.2d at 85). Defendants cannot blame Banks for the pressures caused by defendants' own business decisions and by general economic conditions (*Alexander*, 97 Ill.App.3d at 815, 53 Ill.Dec.

at 199, 423 N.E.2d at 583). *Banks* were not responsible for the downturn in the oil industry.

Threatened bankruptcy is insufficient to create economic duress (*Higgins*, 76 Ill. App.3d at 278, 32 Ill.Dec. at 138, 395 N.E.2d at 85). Quite the contrary is true on defendants' own version of things: Bankruptcy proceedings would appear to have been their opportunity for legal escape from oppressive demands by Banks. Any resulting financial embarrassment from declaring bankruptcy is not sufficient to explain why such legal redress would be inadequate (see *Oleet*, 137 N.Y.S.2d at 783).[33]

Defendants cannot create an inference of coercion by pointing to Banks' greater size (*Alexander*, 97 Ill.App.3d at 815, 53 Ill.Dec. 199, 423 N.E.2d at 583). Disparities in bargaining strength do not equate with—or even provide prima facie evidence of—coercion. In any case, defendants' ability to declare bankruptcy was a two-edged sword: It posed an obvious threat to Banks' interests, just as defendants say *they* preferred to avoid that consequence.

Claims of economic duress must be evaluated "in light of all circumstances surrounding a given transaction" (*Higgins*, 76 Ill.App.3d at 278, 32 Ill.Dec. at 138, 395 N.E.2d at 85). Here those circumstances completely fail to support any such defense

---

as to the Gibraltar Guaranty because of "testimony" from former officers of Penn Square. But the relevant time for such knowledge was *before* the Agreement was negotiated. Defendants' only proof of such "testimony" is an affidavit from Penn Square Vice President William Patterson dated March 21, 1986, many months *after* those negotiations.

**30.** Consistently with their disregard of separate identifies, defendants do not explain how those threats put any pressure on Cobra, which owed neither Bank any money before the Agreement was negotiated.

**31.** What that assertion conveniently omits is that defendants' alternative was bankruptcy because the debt involved (with possible minor fractional exceptions) was valid. Banks cannot be faulted for insisting on repayment, nor can defendants avoid their perfectly valid debts because Banks "forced" them to recognize other allegedly invalid debts. At most defendants could avoid those invalid obligations.

**32.** Whatever the banks' alacrity in welcoming such loan opportunities, they were not after all defendants' partners in drilling for oil and gas. Defendants' current position would convert Banks not only into partners but into the only *general* partners—with defendants as *limited* partners spared personal liability!

**33.** *Oleet* rejected debtors' efforts to use financial embarrassment as an excuse for not asserting a defense they had to all their creditors' demands. Here defendants attempt to use a similar excuse to escape *all* their bank debts when they had a defense to only a small part of them. Defendants cannot be in a better position than the debtors in *Oleet* simply because most of Banks' demands were concededly legitimate. At best defendants would have a defense to the Gibraltar Guaranty, and even that defense fails because defendants had a viable alternative, bankruptcy, to Banks' "harsh" terms for renegotiating their debts.

to the Notes or Guaranties, including any obligation attributable to the Gibraltar Guaranty. It is relevant (though not dispositive [34]) that defendants were represented by counsel when they negotiated the Agreement over a period of several months (Jersild Aff. ¶ 6). Indeed, their lawyer provided Banks with a letter representing that the Notes and Guaranties were enforceable (Ex. 2 to Jersild Aff.). Defendants were fully aware of the rights they were waiving under the Agreement. Those concessions were, to be sure, the result of hard bargaining by Banks. But if defendants felt compelled to give up (or grant) any rights to Banks, that compulsion was caused by defendants' own financial dealings gone sour—not by Banks' legitimate attempts to gain concessions from defendants in return for Banks' own concessions. In our free market system, it is not the function of the judiciary to measure economic adversaries' bargained concessions in retrospect, upsetting the scales the parties themselves perceived as balanced when they struck their deal.

### Section 1972

■ Defendants claim Banks' conditioning of the Agreement upon Linns' waiving their defenses to the Gibraltar and OTex Guaranties violated Section 1972, which prohibits tying arrangements by banks. Section 1972(1)(C) forbids banks from extending credit or furnishing any service on the condition:

> that the customer provide some additional credit, property or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service.

Section 1975 provides for treble damage suits when Section 1972 is violated.[35]

*McCoy v. Franklin Savings Association,* 636 F.2d 172, 175 (7th Cir.1980) (citations omitted) describes Section 1972's function:

> Section 1972 was intended only to "prohibit anti-competitive practices which require bank customers to accept or provide some other service or product or refrain from dealing with other parties in order to obtain the bank product or service they desire." .:. It "was not intended to interfere with the conduct of appropriate traditional banking practices" ... or to prohibit attempts (like these) by banks to protect their investments.

In those terms, defendants fail to state claims under Section 1972 because Banks' conduct (1) was not anti-competitive and (2) was an appropriate traditional banking practice designed to protect their investments.[36]

Although some courts have held Section 1972 establishes a per se rule and does not require a showing of anti-competitive effects (see, e.g., *Nordic Bank,* 619 F.Supp. at 556 n. 9), our own Court of Appeals has strongly suggested that is not the case. *Exchange National Bank of Chicago v. Daniels,* 768 F.2d 140, 143–44 (7th Cir. 1985) (citation and footnote omitted) elaborates on that court's statement in *McCoy:*

> This court has construed § 1972 as prohibiting exclusive dealing practices— those that attempt to prevent customers from dealing with other banks.... It is similar to other anti-tying laws meant to preserve competition among rival businesses. We treat it, in other words, as the banking equivalent of § 3 of the

**34.** Contrary to S–F's and FDIC's repeated assertions, representation by counsel does not automatically negate economic duress (*Holzman v. Barrett,* 192 F.2d 113, 118 (7th Cir.1951)), though it is a relevant factor (see *Alexander,* 97 Ill.App.3d at 816, 53 Ill.Dec. at 199, 423 N.E.2d at 583). This opinion need not decide whether defendants are even weaker legally in that respect because Linn is himself a lawyer.

**35.** Defendants assert damage counterclaims under Section 1975 against FDIC and S–F, plus a third-party claim against Continental for such

treble damages. Defendants' counterclaim against FDIC would be limited to a setoff of their liability to FDIC under the Continental Note—and then only if FDIC could be held at all responsible for Continental's alleged violation of Section 1972.

**36.** Banks' agreement to renegotiate defendants' debts was an extension of credit within the meaning of Section 1972 (*Nordic Bank PLC v. Trend Group, Ltd.,* 619 F.Supp. 542, 555 (S.D.N. Y.1985)).

Clayton Act, 15 U.S.C. § 14. It does not prevent banks from making one in-house loan contingent on another. The Borrowers do not say that the Bank forced them to take credit from the Bank when they really wanted to borrow the money .... somewhere else.

Section 3 of the Clayton Act expressly requires an anti-competitive effect (*Euramca Ecosystems, Inc. v. Roediger Pittsburgh, Inc.*, 581 F.Supp. 415, 421 (N.D.Ill.1984)).

Banks' conduct could not possibly have lessened competition. Any renegotiation of defendants' debts had to involve their creditors—Banks—and the same is true of any resolution of the disputes involving the Gibraltar and OTex Guaranties. As a condition to renegotiating the debts (a concession on Banks' part), Banks required Linns to waive their defenses to the disputed guaranties (a concession by Linns). That tying arrangement did not prevent defendants from dealing with another bank. On the contrary, if defendants found Banks' proposed terms of renegotiation too onerous, they were free to go to another bank or banks to borrow money to repay their debts to Banks.[37]

Banks' terms for renegotiating defendants' debts also fit within the statutory exception for appropriate traditional banking practices, for those terms were a conventional effort to protect Banks' investments. On that score, Banks' conduct as to the Gibraltar Guaranty was less problematic than that as to the OTex Guaranty—but the latter passes muster too.

As a condition to renegotiating debts, banks can properly require additional collateral and impose other terms designed to ensure payment of the extended loans (see *Nordic Bank*, 619 F.Supp. at 557). Banks can and should also be allowed to require their debtors to waive defenses to those debts. Such a condition is a legitimate attempt by a bank to protect its investment. After all, the debtor is asking the bank to put off enforcing its rights, and the bank should be entitled to ask for reciprocal concessions. S–F was thus entitled to require defendants to waive their defense to the Gibraltar Guaranty, one of the debts subject to renegotiation, as a condition to S–F's extending defendants' debts.

Continental's imposition of a condition as to the OTex Guaranty calls for closer scrutiny, for that guaranty was not a part of the debts being renegotiated. Nevertheless Continental's conduct was also proper as an attempt to protect its investment. As defendants themselves allege, their obligations to Penn Square arose out of a continuing relationship of trust and confidence (see Amended Answer ¶¶ 18–19). As an outgrowth of that relationship, Penn Square loaned money to defendants and—on the strength of Linns' guaranties—to others. After Continental had succeeded to Penn Square's position, when defendants then needed to renegotiate some of that debt, Continental was entitled to include *all* the issues raised by *all* defendants' obligations in those negotiations. Continental was responding to defendants' desires by deferring its right to repayment on some debts. That in turn entitled Continental to demand concessions on defendants' other obligations, thus protecting Continental's total investment as represented by *all* defendants' obligations to Continental.[38]

Defendants rely heavily (indeed almost exclusively) on *Nordic Bank* to support their Section 1972 claims. That case cannot carry defendants' baggage for them. It dealt with a situation in which a bank required a debtor to execute wholly *new* guaranties of a third-party's loans as a condition of renegotiating its own debt. Relying on *Costner v. Blount National*

---

**37.** Of course defendants had to deal with Banks, rather than with another bank or banks, if they chose to renegotiate their debt rather than to refinance elsewhere. That, however, is caused by the very nature of renegotiation. Banks can scarcely be faulted for handling the renegotiation of debts already owed to them.

**38.** Although it is not controlling, it is surely relevant that the disputed OTex Guaranty involves $300,000, in comparison to the total debt of over $30 million at issue here. Defendants' effort to taint all of the latter because of a claimed problem with the former—even apart from the unsound nature of defendants' arguments as discussed in this opinion—would present a classic tail-wags-dog situation.

*Bank,* 578 F.2d 1192 (6th Cir.1978),[39] *Nordic Bank,* 619 F.Supp. at 557 held:

> The alleged requirement that [debtor] guarantee several loans for which it was not already responsible constituted a similar imposition on [debtor] unrelated to [bank's] extension of credit.

Here, by contrast, Banks required Linns only to ratify existing guaranties. As already discussed, those guaranties were valid on their face and at worst might arguably have been avoided because of defendants' alleged defenses. They were not entirely new obligations, nor were they unrelated to Banks' renegotiation of defendants' debts.[40]

### S-F Certificate of Deposit

■ Defendants' final counterclaim asks to recover Linns' $5 million certificate of deposit (the "Certificate"), which S-F allegedly applied unlawfully as a setoff against Linns' debts. Linns allege S-F induced them to renew the Certificate at S-F by promising never to use it as such a setoff.

S-F admits using the Certificate as a setoff after Linns had defaulted on their debts and before the Agreement was negotiated. But that treatment was accepted by Linns: Their debt under the S-F Note clearly reflects a $5 million reduction in their original obligation to S-F (compare Agreement Schedule 2 with the S-F Note). Linns thus accepted and took the benefit of that setoff when they executed the Agreement and the S-F Note, both of which are valid. Any claim Linns may have had as to the setoff was waived.[41]

### Third-Party Claims

All that remain to be considered are defendants' third-party claims against Continental under Rule 14(a) for duress, for violations of Section 1972 and to have the Louisiana Mortgage reformed or declared unenforceable. Rule 14(a) allows defendants to join:

> a person not a party to the action who is or may be liable to [defendants] for all or part of the plaintiff's claim against [defendants].

Derivative or secondary liability is central to the concept of third-party claims under Rule 14(a). Impleader is proper only when such a derivative right to relief exists under the applicable substantive law (6 Wright & Miller, *Federal Practice and Procedure: Civil* § 1446, at 248–50 (1971)). Once defendants have asserted a valid third-party claim against Continental, they could under Rule 18 join any other claim they might have against Continental (*id.* § 1452).[42]

■ Defendants' duress and Section 1972 claims against Continental must be dismissed: They fail to state a cause of action for the reasons already discussed. That leaves only defendants' claim as to the Louisiana Mortgage. It must be dismissed as improper third-party pleading under Rule 14(a).

■ None of defendants' third-party claims (and particularly the surviving Louisiana Mortgage claim) clearly alleges a derivative claim against Continental. Nevertheless defendants insist their duress claim

---

**39.** *Costner* offers even less aid to defendants than *Nordic Bank,* and it really does not wholly support the *Nordic Bank* result, which represents the furthest extension of potential liability under Section 1972. In *Costner* a loan to buy the outstanding stock of an automobile dealership was illegally conditioned on the buyer agreeing to sell a part of its retail automobile commercial installment paper to the bank. That condition was clearly unrelated to the loan, as the bank conceded on appeal (578 F.2d at 1194).

**40.** This Court thus does not view *Nordic Bank* as authority for defendants' contentions. But even if it were, this Court would simply decline to follow it in the situation posed by this case.

**41.** Even had there not been a waiver, Linns can identify no resulting damages. Because the application of the Certificate reduced their debt pro tanto, the only economic effect on them would be the interest-rate spread between the Certificate and the S-F Note—doubtless a benefit to Linns rather than a harm.

**42.** Subject matter jurisdiction would not be a problem for such claims. Although ancillary jurisdiction is available only for certain claims, it would not be necessary here because Continental and defendants have completely diverse citizenship.

seeks to recover from Continental whatever amounts defendants may have to pay to FDIC on the Continental Note. Defendants' "amendment by memorandum" of their duress claim, even if allowed,[43] might perhaps turn it into an arguable derivative claim, but it would be a claim totally without precedent. Defendants have not offered, and this Court cannot find, a single case using economic duress as the basis for such an implied indemnity cause of action. Because defendants were not required to implead Continental (see Rule 14(a) and 6 Wright & Miller § 1446), if that were the only problem with their duress claim this Court would exercise its discretion to require defendants to present their novel cause of action to an Illinois court (see *Shaw v. Republic Drill Corp.*, 810 F.2d 149, 150 (7th Cir.1987) (per curiam)).

█ But defendants do not even argue that their Section 1972 claim and their Louisiana Mortgage claim are proper derivative claims under Rule 14(a). Instead those claims are asserted under Rule 18 as pendent to defendants' duress claim for indemnity. Their Section 1972 claim fails to state a cause of action, but it and the Louisiana Mortgage claim must also be dismissed because—with the collapse of defendants' duress claim against Continental—those pendent claims do not have a proper Rule 14(a) leg to stand on.

### Conclusion

There is no genuine dispute as to any material fact relevant to FDIC's and S–F's claims under the Notes and Guaranties. Defendants' affirmative defense to their liability on those Notes and Guaranties fails as a matter of law. FDIC is entitled to a joint and several judgment as a matter of law against Linns, ASA, Red Stone and Cobra for $25,320,951 plus interest as provided for under the Agreement. S–F is entitled to a like joint and several judgment as a matter of law against the same parties

for $9,747,236 plus interest as provided for under the Agreement.

All of defendants' counterclaims against FDIC and S–F fail to state a cause of action and are dismissed. Defendants' third-party claims against Continental for duress and under Section 1972 are also dismissed for failure to state a cause of action. Their claim as to the Louisiana Mortgage is dismissed as improper third-party pleading.

Under the Notes and Guaranties FDIC and S–F are entitled to their reasonable attorneys' fees and expenses incurred in this action to collect amounts properly due under those obligations. No view is expressed here as to the finality and enforceability of the judgments against defendants before presentation and ascertainment of the claim for such fees and expenses.

### APPENDIX

Defendants' duress counterclaims and their third-party claim against Continental seek damages for injuries to "their business and property." As Continental points out, quoting Dobbs, *Remedies* § 10.2, at 657 (1973):

> But the point is that in spite of these matters [the fact that an act amounting to duress may also amount to some other tort], duress is not in and of itself a recognized tort. This means that the plaintiff who has been coerced does not have the option available to a victim of fraud: he may not choose between affirmance of the duress and a suit for damages on the one hand and disaffirmance and restitution on the other. He has no suit for damages under this tradional rule, unless he can establish some independent tort. This may be changing, however, at least to the extent that restitution in money may be appropriate, and may be called "damages" in the opinions.

Other authorities agree with that rule and explain further (Annotation, *Economic Du-*

---

**43.** Litigants' efforts to paper over pleading deficiencies in their legal memoranda are all too common (see, e.g., *National Union Fire Ins. Co. v. Continental Illinois Corp.*, 658 F.Supp. 775, 778 (N.D.Ill.1987)) but nevertheless inherently

improper (*Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985)).

*ress*, 79 ALR 3d at 611, citing Dobbs (footnotes omitted):

> Accordingly, it has been pointed out that actions involving duress, rather than being concerned with retributive or compensatory justice, are primarily concerned with restoratory justice.

> \*    \*    \*    \*    \*    \*

> The fact that some authorities have indicated that an action may be brought to recover "damages" for economic duress does not appear to mean that the coerced party has an additional remedy, since, as one commentator [Dobbs] has pointed out, such statements, rather than being inconsistent with the view that duress is concerned primarily with restoratory justice and is not a tort, are merely another way of recognizing that in cases where the property transferred is incapable of being returned, the restitution may take the form of money "damages."

*Schlossberg v. E.L. Trendel & Associates, Inc.,* 63 Ill.App.3d 939, 20 Ill.Dec. 741, 380 N.E.2d 950 (1st Dist.1978), cited by defendants, fully supports that view of duress claims for damages. *Schlossberg* merely held a plaintiff could sue for restitution of money paid under an agreement allegedly invalidated because of defendant's economic duress.

Defendants' duress claims do not rely on some independent tort. That means when they seek "damages" their claims are limited to recovering (1) whatever amounts they have paid to Banks under the allegedly invalid Notes and Agreement and (2) under their third-party claim against Continental, whatever amounts they may have to pay to FDIC on its claims. To the extent defendants' duress claims seek any other "damages," they fail to state a cause of action.